(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHASE BANK USA, N. A. *v.* McCOY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–329.   Argued December 8, 2010—Decided January 24, 2011

Regulation Z—promulgated by the Federal Reserve Board (Board) pursuant to its authority under the Truth in Lending Act—requires credit card issuers to disclose certain information to cardholders. The version of the regulation in effect at the time this dispute arose obliges issuers to provide to cardholders an "[i]nitial disclosure statement," 12 CFR §226.6, specifying "each periodic rate that may be used to compute the finance charge," §226.6(a)(2). It also imposes "[s]ubsequent disclosure requirements," §226.9, including notice to cardholders "[w]henever any term required to be disclosed under §226.6 is changed," §226.9(c)(1). When "a periodic rate or other finance charge is increased because of the consumer's delinquency or default," notice must be given "before the effective date of the change." *Ibid.*

   At the time respondent McCoy filed suit, he was the holder of a credit card issued by petitioner Chase Bank. The cardholder agreement provided, in relevant part, that McCoy was eligible for "Preferred rates" as long as he met certain conditions. If any of those conditions were not met, Chase reserved the right to raise the rate, up to a pre-set maximum, and to apply the change to both existing and new balances. McCoy alleges that Chase increased his interest rate due to his delinquency or default and applied that increase retroactively, and that this action violated Regulation Z because Chase did not notify him of the increase until after it had taken effect. The District Court dismissed his complaint, holding that because the increase did not constitute a "change in terms" under §226.9(c), Chase was not required to notify him of the increase before implementing it. The Ninth Circuit reversed in relevant part, holding that Regulation

Z requires issuers to provide notice of an interest-rate increase prior to its effective date.

*Held:* At the time of the transactions at issue, Regulation Z did not require Chase to provide McCoy with a change-in-terms notice before implementing the agreement term allowing it to raise his interest rate, up to a pre-set maximum, following delinquency or default. Pp. 7–19.

  (a) This case requires the Court to determine the meaning of a regulation promulgated by the Board under its statutory authority. However, Regulation Z's text is unclear with respect to the crucial interpretive question at issue: whether a change to an interest rate, pursuant to previously-disclosed contractual provision, constitutes a change to a "term required to be disclosed under §226.6" requiring a subsequent disclosure under §226.9(c)(1). Because of this ambiguity, the Court must look to the Board's own interpretation of the regulation for guidance in deciding this case. Pp. 7–12.

  (b) The Board has made clear in its *amicus* brief to this Court that, in its view, Chase was not required to give McCoy notice of the interest rate increase under the applicable version of Regulation Z. This Court defers to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer* v. *Robbins*, 519 U. S. 452, 461 (internal quotation marks omitted). In *Auer*, the Court deferred to the Secretary of Labor's interpretation of his own regulation, presented in an *amicus* brief submitted by the agency at the Court's invitation. The Court held that the fact that the interpretation came in a legal brief did not, "in the circumstances of th[at] case, make it unworthy of deference." *Id.*, at 462. The interpretation was "in no sense a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack," *ibid.* (internal quotation marks and alteration omitted), and there was "no reason to suspect that the interpretation [did] not reflect the agency's fair and considered judgment on the matter in question," *ibid.* The brief submitted by the Board here, at the Court's invitation, is no different. As in *Auer*, there is no reason to believe that the Board's interpretation is a "*post hoc* rationalization" taken as a litigation position, for the Board is not a party to this case. And its interpretation is neither "plainly erroneous" nor "inconsistent with" the indeterminate text of Regulation Z. Thus, there is no reason to suspect that the Board's position in its *amicus* brief reflects anything other than its fair and considered judgment as to what the regulation required at the time this dispute arose. That Congress and the Board may currently hold a different view does not mean that deference is not warranted to the Board's understanding of what the applicable version of Regulation Z re-

Syllabus

quired.  Under *Auer*, therefore, it is clear that deference to the inter-
pretation in the agency *amicus* brief is warranted.  Pp. 12–16.

   (c) McCoy errs in arguing that deference to a legal brief is inappro-
priate because the interpretation of Regulation Z in the Official Staff
Commentary commands a different result.    While Commentary
promulgated by the Board as an interpretation of Regulation Z may
warrant deference as a general matter, the Commentary explaining
the requirements at issue in this case largely replicates the ambigu-
ity present in the regulatory text, and therefore offers no reason to
disregard the interpretation advanced in the Board's *amicus* brief.
Pp. 16–19.

559 F. 3d 963, reversed and remanded.

   SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–329

_____

## CHASE BANK USA, N. A., PETITIONER *v.* JAMES A. McCOY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 24, 2011]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

As applicable to this case, Regulation Z—promulgated by the Board of Governors of the Federal Reserve System (Board) pursuant to its authority under the Truth in Lending Act (TILA), 82 Stat. 146, 15 U. S. C. §1601 *et seq.*—requires that issuers of credit cards provide cardholders with an "[i]nitial disclosure statement" specifying, *inter alia*, "each periodic rate" associated with the account. 12 CFR §226.6(a)(2) (2008). The regulation also imposes "[s]ubsequent disclosure requirements," including notice to cardholders "[w]henever any term required to be disclosed under §226.6 is changed." §226.9(c)(1). This case presents the question whether Regulation Z requires an issuer to notify a cardholder of an interest-rate increase instituted pursuant to a provision of the cardholder agreement giving the issuer discretion to increase the rate, up to a stated maximum, in the event of the cardholder's delinquency or default. We conclude that the version of Regulation Z applicable in this case does not require such notice.

# I
## A

Congress passed TILA to promote consumers' "informed use of credit" by requiring "meaningful disclosure of credit terms," 15 U. S. C. §1601(a), and granted the Board the authority to issue regulations to achieve TILA's purposes, §1604(a). Pursuant to this authority, the Board promulgated Regulation Z, which requires credit card issuers to disclose certain information to consumers.[1] Two provisions of Regulation Z are at issue in this case. The first, 12 CFR §226.6, explains what information credit card issuers are obliged to provide to cardholders in the "[i]nitial disclosure statement," including "each periodic rate that may be used to compute the finance charge." §226.6(a)(2). The second, §226.9, imposes upon issuers certain "[s]ubsequent disclosure requirements," including a requirement to provide notice "[w]henever any term required to be disclosed under §226.6 is changed." §226.9(c)(1). As a general matter, notice of a change in terms has to be provided 15 days in advance of the effective date of the change. *Ibid.* When "a periodic rate or other finance charge is increased because of the consumer's delinquency or default," however, notice only need be given "before the effective date of the change." *Ibid.* Regulation Z also explains that no notice is required under §226.9 when the change in terms "results from . . . the consumer's default or delinquency (other than an increase in the periodic rate or other finance charge)." §226.9(c)(2).

The official interpretation of Regulation Z (Official Staff Commentary or Commentary) promulgated by the Board

---

[1] As discussed more fully below, see *infra*, at 4–5, in 2009 the Board amended Regulation Z, such that the provisions discussed in this opinion are no longer in effect. However, because the pre-2009 provisions are the ones applicable to the case before us, we will refer to them in the present tense.

explains these requirements further: Section 226.9(c)(1)'s notice-of-change requirement does not apply "if the specific change is set forth initially, such as . . . an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum." 12 CFR pt. 226, Supp. I, Comment 9(c)–1, p. 506 (2008) (hereinafter Comment 9(c)–1). On the other hand, the Commentary explains, "notice must be given if the contract allows the creditor to increase the rate at its discretion but does not include specific terms for an increase (for example, when an increase may occur under the creditor's contract reservation right to increase the periodic rate)." *Ibid.* As to the timing requirements, the Commentary states: "[A] notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change . . . [i]f there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default." *Id.*, Comment 9(c)(1)–3, at 507 (hereinafter Comment 9(c)(1)–3).

At least as early as 2004, the Board began considering revisions to Regulation Z. The new regulations the Board eventually issued do not apply to the present case, but the details of their promulgation provides useful background in considering the parties' arguments with respect to the version of Regulation Z we address here. In 2004 the Board issued an advance notice of proposed rulemaking announcing its intent to consider revisions. 69 Fed. Reg. 70925 (2004). In so doing, the Board described how it understood the notice requirements to function at that time:

"[A]dvance notice is not required in all cases. For example, if the interest rate or other finance charge increases due to a consumer's default or delinquency,

notice is required, but need not be given in advance. 12 CFR 226.9(c)(1); comment 9(c)(1)–3. And no change-in-terms notice is required if the creditor specifies in advance the circumstances under which an increase to the finance charge or an annual fee will occur. Comment 9(c)–1. For example, some credit card account agreements permit the card issuer to increase the interest rate if the consumer pays late . . . . Under Regulation Z, because the circumstances are specified in advance in the account agreement, the creditor need not provide a change-in-terms notice 15 days in advance of the increase; the new rate will appear on the periodic statement for the cycle in which the increase occurs." *Id.,* at 70931–70932.

The Board asked for public comment on whether these "existing disclosure rules" were "adequate to enable consumers to make timely decisions about how to manage their accounts." *Id.*, at 70932.

Subsequently, in 2007, the Board published proposed amendments to Regulation Z and the Commentary. 72 Fed. Reg. 32948. One amendment would have required 45 days' advance written notice when "(i) [a] rate is increased due to the consumer's delinquency or default; or (ii) [a] rate is increased as a penalty for one or more events specified in the account agreement, such as making a late payment or obtaining an extension of credit that exceeds the credit limit." *Id.*, at 33058 (proposed 12 CFR §226.9(g)). The Board explained that, under the amendments, "creditors would no longer be permitted to provide for the immediate application of penalty pricing upon the occurrence of certain events specified in the contract." 72 Fed. Reg. 33012.

In January 2009, the Board promulgated a final rule implementing many of the proposed changes, scheduled to be effective July 1, 2010. 74 Fed. Reg. 5244. Most sali-

ently, the Board included a new provision, §226.9(g), which requires 45 days' advance notice of increases in rates due to cardholder delinquency or default, or as a penalty, including penalties for "events specified in the account agreement, such as making a late payment . . . ." 12 CFR §226.9(g)(1)(2010). In May 2009, Congress enacted the Credit Card Accountability Responsibility and Disclosure Act (Credit CARD Act or Act), 123 Stat. 1734. The Act amended TILA, in relevant part, to require 45 days' advance notice of most increases in credit card annual percentage rates. 15 U. S. C. §1637(i) (2006 ed., Supp. III). Because the Credit CARD Act's notice requirements with respect to interest-rate increases largely mirror the requirements in the new version of the regulation, the Board changed the effective date of those requirements to August 20, 2009, to coincide with the statutory schedule. See 74 Fed. Reg. 36077–36079. The transactions giving rise to the dispute at issue in this case, however, arose prior to enactment of the Act and the promulgation of the new regulatory provisions.

B

Respondent James A. McCoy brought this action in the Superior Court of Orange County, California on behalf of himself and others similarly situated against petitioner Chase Bank USA, N. A.; Chase removed the action to the United States District Court for the Central District of California under 28 U. S. C. §1441. At the time of the transactions at issue, McCoy was the holder of a credit card issued by Chase. The cardholder agreement between the parties (Agreement) provides, in relevant part, that McCoy is eligible for "Preferred rates," but that to keep such rates he has to meet certain conditions, including making "at least the required minimum payments when due on [his] Account and on all other loans or accounts with [Chase] and [his] other creditors." Brief for Respon-

dent 8, n. 2; see also 559 F. 3d 963, 972, n. 1 (CA9 2009)
(Cudahy, J., dissenting). If any of the conditions in the
Agreement are not met, Chase reserves the right to
"change [McCoy's] interest rate and impose a Non-
Preferred rate up to the maximum Non-Preferred rate
described in the Pricing Schedule" and to apply any
changes "to existing as well as new balances . . . effective
with the billing cycle ending on the review date." Brief for
Respondent 8, n. 2.

McCoy's complaint alleges that Chase increased his
interest rate due to his delinquency or default, and applied
that increase retroactively. McCoy asserts that the rate
increase violates Regulation Z because, pursuant to the
Agreement, Chase did not notify him of the increase until
after it had taken effect.[2] The District Court dismissed
McCoy's complaint, holding that because the increase did
not constitute a "change in terms" as contemplated by
§226.9(c), Chase was not required to notify him of the
increase before implementing it. See App. to Pet. for Cert.
37a–47a.

A divided panel of the United States Court of Appeals
for the Ninth Circuit reversed in relevant part, holding
that Regulation Z requires issuers to provide notice of an
interest-rate increase prior to its effective date. See 559
F. 3d, at 969. Concluding that the text of Regulation Z is
ambiguous and that the agency commentary accompany-
ing the 2004 request for comments and the 2007 proposed
amendments favors neither party's interpretation, the
court relied primarily on the Official Staff Commentary; in
particular, the court noted that Comment 9(c)–1 requires
no notice of a change in terms if the "specific change" at

—————

[2] McCoy also asserted various state-law claims that are not before us.
We note that McCoy's complaint provides little detail regarding the
transactions at issue in this case. The parties, however, are in agree-
ment as to the essential facts alleged.

issue is set forth in the initial agreement. See *id.*, at 965–
967. The court found, however, that because the Agree-
ment vests Chase with discretion to impose any Non-
Preferred rate it chooses (up to the specified maximum)
upon McCoy's default, the Agreement "provides McCoy
with no basis for predicting in advance what retroactive
interest rate Chase will choose to charge him if he de-
faults." *Id.*, at 967. Accordingly, the court held that be-
cause the Agreement does not alert McCoy to the "specific
change" that will occur if he defaults, Chase was obliged to
give notice of that change prior to its effective date. *Ibid.*
Relying primarily on the 2004 notice of proposed rulemak-
ing and the 2007 proposed amendments, the dissenting
judge concluded that Regulation Z does not require notice
of an interest-rate increase in the circumstances of this
case. See *id.*, at 972–979 (opinion of Cudahy, J.).

After the Ninth Circuit's ruling, the United States Court
of Appeals for the First Circuit decided the same question
in Chase's favor. See *Shaner* v. *Chase Bank USA, N. A.*,
587 F. 3d 488 (2009). The First Circuit relied in part on
an *amicus* brief submitted by the Board at the court's
request, in which the agency advanced the same interpre-
tation of Regulation Z that it now does before this Court.
*Id.*, at 493. We granted certiorari to resolve this division
in authority.[3] 561 U. S. ___ (2010).

## II

In order to decide this case, we must determine whether
an interest-rate increase constitutes a "change in terms"
under Regulation Z, when the change is made pursuant to
a provision in the cardholder agreement allowing the

—————

[3] The United States Court of Appeals for the Seventh Circuit has also
rejected the reasoning of the Ninth Circuit, though on a different
question than the one presented in this case. See *Swanson* v. *Bank of
America, N. A.*, 559 F. 3d 653, reh'g denied, 563 F. 3d 634 (2009)
(disagreeing with the Ninth Circuit's interpretation of Regulation Z).

issuer to increase the rate, up to a stated maximum, in the event of the cardholder's delinquency or default. Accordingly, this case calls upon us to determine the meaning of a regulation promulgated by the Board under its statutory authority. The parties dispute the proper interpretation of the regulation itself, as well as whether we should accord deference to the Board's interpretation of its regulation. As explained below, we conclude that the text of the regulation is ambiguous, and that deference is warranted to the interpretation of that text advanced by the Board in its *amicus* brief.

A

Our analysis begins with the text of Regulation Z in effect at the time this dispute arose. First, §226.6 requires an "[i]nitial disclosure statement":

> "The creditor shall disclose to the consumer, in terminology consistent with that to be used on the periodic statement, each of the following items, to the extent applicable:
>
> "(a) *Finance charge.* The circumstances under which a finance charge will be imposed and an explanation of how it will be determined, as follows:
>
> .          .          .          .          .
>
> "(2) A disclosure of each periodic rate that may be used to compute the finance charge, the range of balances to which it is applicable, and the corresponding annual percentage rate. When different periodic rates apply to different types of transactions, the types of transactions to which the periodic rates apply shall also be disclosed." (Footnotes omitted.)

Second, §226.9(c) requires certain "[s]ubsequent disclosure requirements":

> "*Change in terms*—(1) *Written notice required.* Whenever any term required to be disclosed under

§226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15-day timing requirement does not apply if the change has been agreed to by the consumer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

"(2) *Notice not required.* No notice under this section is required when the change . . . results from . . . the consumer's default or delinquency (other than an increase in the periodic rate or other finance charge)."

The question is whether the increase in McCoy's interest rate constitutes a change to a "term required to be disclosed under §226.6," requiring a subsequent disclosure under §226.9(c)(1). One of the initial terms that must be disclosed under §226.6 is "each periodic rate that may be used to compute the finance charge . . . and the corresponding annual percentage rate." §226.6(a)(2). McCoy argues that, because an increase in the interest rate increases the "periodic rate" applicable to his account, such an increase constitutes a change in terms within the meaning of §226.9(c)(1). As further support, McCoy points to two provisions in §226.9(c): first, that notice of an increase in the interest rate must be provided "before the effective date of the change" when the increase is due to "the consumer's delinquency or default," §226.9(c)(1); and second, that no notice is required of a change resulting "from the consumer's default or delinquency (other than an increase in the periodic rate or other finance charge)," §226.9(c)(2). Accordingly, because §226.9(c) includes interest-rate increases due to delinquency or default,

McCoy argues that the plain text of the regulation indi-cates that a change in the periodic rate due to such default is a "change in terms" requiring notice under §226.9(c)(1).

We recognize that McCoy's argument has some force; read in isolation, the language quoted above certainly suggests that credit card issuers must provide notice of an interest-rate increase imposed pursuant to cardholder delinquency or default. But McCoy's analysis begs the key question: whether the increase actually changed a "term" of the Agreement that was "required to be disclosed under §226.6." If not, §226.9(c)'s subsequent notice requirement with respect to a "change in terms" does not apply. Chase argues precisely this: The increase did not change a term in the Agreement, but merely implemented one that had been initially disclosed, as required. This interpretation, though not commanded by the text of the regulation, is reasonable. Section 226.6(a)(2) requires initial disclosure of "each periodic rate that may be used to compute the finance charge." The Agreement itself discloses both the initial rate (Preferred rate) and the maximum rate to be imposed in the event of default (Non-Preferred rate). See Brief for Respondent 8, n. 2; Brief for Petitioner 13–14.[4] Accordingly, it is plausible to understand the Agreement to initially disclose "each periodic rate" to be applied to the account, and Chase arguably did not "change" those rates as a result of McCoy's default. Instead, Chase merely implemented the previously disclosed term specifying the Non-Preferred rate.[5]

---

[4] The Pricing Schedule referred to in the Agreement is not contained in the case record, nor are its contents apparent from the parties' briefs, but neither side disputes that it specified a maximum Non-Preferred rate applicable to the Agreement.

[5] We are not persuaded by McCoy's argument that, although Chase did not change a "contract term" when it raised his interest rate pursu-ant to the terms of the Agreement, it changed a "credit term," thereby triggering §226.9(c)'s notice requirement. The relevant text of Regula-

This reading still leaves the question why §226.9(c)(1) refers to interest-rate increases resulting from delinquency or default if such increases do not constitute a "change in terms." One reasonable explanation Chase offers is that §226.9(c)(1) refers to interest-rate increases that were not specifically outlined in the agreement's initial terms (unlike those in the present Agreement). For example, credit card agreements routinely include a "reservation of rights" provision giving the issuer discretion to change the terms of the contract, often as a means of responding to events that raise doubts about the cardholder's creditworthiness. An issuer may exercise this general contract-modification authority and raise the interest rate applicable to the account to address any heightened risk. See Brief for Petitioner 6. In such a case, §226.9(c)(1) is best read to require that notice must be given prior to the effective date of the increase, because the unilateral increase instituted by the issuer actually changed a term—the interest rate—in a manner not specifically contemplated by the agreement.[6] See Comment 9(c)–1 (providing that notice is required if the agreement "does not include specific terms for an increase (for exam-

_____

tion Z does not refer to, let alone distinguish between, "contract terms" and "credit terms," and McCoy's repeated citations to TILA's broad policy statement do not convince us that such a distinction is warranted. See 15 U. S. C. §1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit").

[6] The Government offers an alternative example. Assume that the agreement is similar to the one at issue here, with a specified maximum level to which the interest rate can be increased if the cardholder defaults. If default occurs but the issuer raises the rate above the contractual maximum, notice must be given prior to the effective date because the issuer actually changed the term of the contract initially specifying the maximum rate possible. See Brief for United States as *Amicus Curiae* 14–15.

ple, when an increase may occur under the creditor's
contract reservation right to increase the periodic rate)").

In short, Regulation Z is unclear with respect to the
crucial interpretive question: whether the interest-rate
increase at issue in this case constitutes a "change in
terms" requiring notice. We need not decide which party's
interpretation is more persuasive, however; both are
plausible, and the text alone does not permit a more de-
finitive reading. Accordingly, we find Regulation Z to be
ambiguous as to the question presented, and must there-
fore look to the Board's own interpretation of the regula-
tion for guidance in deciding this case. See *Coeur Alaska,
Inc.* v. *Southeast Alaska Conservation Council*, 557 U. S.
___, ___ (2009) (slip op., at 14) (stating that when an
agency's regulations construing a statute "are ambiguous
. . . we next turn to the agencies' subsequent interpreta-
tion of those regulations" for guidance); *Ford Motor Credit
Co.* v. *Milhollin*, 444 U. S. 555, 560 (1980) (stating that
when the question presented "is not governed by clear
expression in the . . . regulation . . . it is appropriate to
defer to the Federal Reserve Board and staff in determin-
ing what resolution of that issue" is appropriate).

B

The Board has made clear in the *amicus* brief it has
submitted to this Court that, in the Board's view, Chase
was not required to give McCoy notice of the interest rate
increase under the version of Regulation Z applicable at
the time. Under *Auer* v. *Robbins*, 519 U. S. 452 (1997), we
defer to an agency's interpretation of its own regulation,
advanced in a legal brief, unless that interpretation is
"plainly erroneous or inconsistent with the regulation."
*Id.*, at 461 (internal quotation marks omitted). Because
the interpretation the Board presents in its brief is consis-
tent with the regulatory text, we need look no further in

deciding this case.[7]

In its brief to this Court, the Board explains that the Ninth Circuit "erred in concluding that, at the time of the transactions at issue in this case, Regulation Z required credit card issuers to provide a change-in-terms notice before implementing a contractual default-rate provision." See Brief for United States as *Amicus Curiae* 11; see also *ibid.* (stating that when a term of an agreement authorized the credit provider "to increase a consumer's interest rate if the consumer failed to make timely payments . . . any resulting rate increase did not represent a 'change in terms,' but rather the implementation of terms already set forth in the initial disclosure statement"); *id.,* at 15–16 (stating that "[w]hen a cardholder agreement identifies a contingency that triggers a rate increase, and the maximum possible rate that the issuer may charge if that contingency occurs," then "no change-in-terms notice is required" under Regulation Z).[8] Under the principles set forth in *Auer*, we give deference to this interpretation.

In *Auer* we deferred to the Secretary of Labor's interpretation of his own regulation, presented in an *amicus* brief submitted by the agency at our invitation. 519 U. S., at

---

[7]We note that, in reaching its decision, the Ninth Circuit did not have the benefit of briefing from the Board. The Ninth Circuit apparently did not solicit the views of the Board in the proceedings below, see Brief for Petitioner 16, and the First Circuit did not solicit the Board's views in *Shaner* v. *Chase Bank USA, N. A.*, 587 F. 3d 488 (2009), until after the Ninth Circuit issued its opinion in this case, see Order in No. 09–1157 (CA1, Aug. 4, 2009).

[8]This is consistent with the view the Board advanced in its *amicus* brief to the First Circuit, in which the Board noted that it "has interpreted the applicable provisions of Regulation Z not to require a pre-effective date change-in-terms notice for an increase in annual percentage rate when the contingency that will trigger a rate increase and the specific consequences for the consumer's rate are set forth in the initial card member agreement." App. to Brief for United States as *Amicus Curiae* 2a.

461–462. Responding to the petitioners' objection that the agency's interpretation came in a legal brief, we held that this fact did not, "in the circumstances of this case, make it unworthy of deference." *Id.*, at 462. We observed that "[t]he Secretary's position is in no sense a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Ibid.* (quoting *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 212 (1988)). We added: "There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U. S., at 462.

The brief submitted by the Board in the present case, at our invitation, is no different. As in *Auer*, there is no reason to believe that the interpretation advanced by the Board is a "*post hoc* rationalization" taken as a litigation position. The Board is not a party to this case. And as is evident from our discussion of Regulation Z itself, see Part II–A, *supra*, the Board's interpretation is neither "plainly erroneous" nor "inconsistent with" the indeterminate text of the regulation. In short, there is no reason to suspect that the position the Board takes in its *amicus* brief reflects anything other than the agency's fair and considered judgment as to what the regulation required at the time this dispute arose.

McCoy may well be correct in asserting that it is better policy to oblige credit-card issuers to give advance notice of a rate increase; after all, both Congress and the Board have recently indicated that such a requirement is warranted. See Credit CARD Act, §101(a)(1), 123 Stat. 1735–1736; 12 CFR §226.9(g) (2009). That Congress and the Board may currently hold such views does not mean, however, that deference is not warranted to the Board's different understanding of what the pre-2009 version of Regulation Z required. To the contrary, the interpretation the Board advances in its *amicus* brief is entirely consis-

tent with its past views. The 2004 notice of rulemaking and the 2007 proposed amendments to Regulation Z make clear that, prior to 2009, the Board's fair and considered judgment was that "no change-in-terms notice is required if the creditor specifies in advance the circumstances under which an increase . . . will occur," 69 Fed. Reg. 70931, and "immediate application of penalty pricing upon the occurrence of certain events specified in the contract" was permissible, 72 Fed. Reg. 33012.

Under *Auer*, therefore, it is clear that deference to the interpretation in the Board's *amicus* brief is warranted. The cases McCoy cites in which we declined to apply *Auer* do not suggest that deference is unwarranted here. In *Gonzales* v. *Oregon*, 546 U. S. 243 (2006), we declined to defer because—in sharp contrast to the present case— the regulation in question did "little more than restate the terms of the statute" pursuant to which the regulation was promulgated. *Id.*, at 257. Accordingly, no deference was warranted to an agency interpretation of what were, in fact, Congress' words. *Ibid.* In contrast, at the time of the transactions in this case, TILA itself included no require- ments with respect to the disclosure of a change in credit terms. In *Christensen* v. *Harris County*, 529 U. S. 576 (2000), we declined to apply *Auer* deference because the regulation in question was unambiguous, and adopting the agency's contrary interpretation would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." 529 U. S., at 588. In light of Regulation Z's ambiguity, there is no such danger here. And our statement in *Christensen* that "deference is war- ranted only when the language of the regulation is am- biguous," *ibid.*, is perfectly consonant with *Auer* itself; if the text of a regulation is unambiguous, a conflicting agency interpretation advanced in an *amicus* brief will necessarily be "plainly erroneous or inconsistent with the regulation" in question. *Auer*, 519 U. S., at 461 (internal

quotation marks omitted). Accordingly, under our prece-
dent deference to the Board's interpretation of its own
regulation, as presented in the agency's *amicus* brief, is
wholly appropriate.

C

McCoy further argues that deference to a legal brief is
inappropriate because the interpretation of Regulation Z
in the Official Staff Commentary commands a different
result. To be sure, the Official Staff Commentary promul-
gated by the Board as an interpretation of Regulation Z
may warrant deference as a general matter. See *Anderson
Bros. Ford* v. *Valencia*, 452 U. S. 205, 219 (1981) (holding
that "the Board's interpretation of its own regulation"
should generally "be accepted by the courts"); *Milhollin*,
444 U. S., at 565 ("Unless demonstrably irrational, Fed-
eral Reserve Board staff opinions construing [TILA] or
Regulation [Z] should be dispositive"). We find, however,
that the Commentary at issue here largely replicates the
ambiguity present in the regulatory text, and therefore it
offers us nothing to which we can defer with respect to the
precise interpretive question before us.[9] Cf. *Smith* v. *City*

—————

[9] We are not persuaded by McCoy's argument that the Board's own
regulations make the Official Staff Commentary "the *exclusive* source of
authorized staff opinion." Brief for Respondent 36 (emphasis added).
In the regulations McCoy cites the Board has indicated only that the
central purpose of the Commentary is to present agency interpretations
that, if relied upon, provide the basis for invoking the good-faith de-
fense to liability under TILA. See 15 U. S. C. §1640(f) (precluding
liability for "any act done or omitted in good faith in conformity . . .
with any interpretation . . . by an official or employee . . . duly author-
ized by the Board to issue such interpretations . . . under such proce-
dures as the Board may prescribe"); 12 CFR pt. 226, App. C (2008)
("[O]fficial staff interpretations of this regulation . . . provide the
protection afforded under [§1640(f)]"); *id.*, Supp. I, Introduction ¶1, p.
451 (same); 46 Fed. Reg. 50288 (1981) (same). McCoy cites no authority
indicating that, in promulgating the Commentary and establishing
certain statutory safe harbors, the Board intended to limit its ability to

*of Jackson*, 544 U. S. 228, 248 (2005) (O'Connor, J., concurring in judgment) (noting that deference is not warranted when "there is no reasoned agency reading of the text to which we might defer").

The Ninth Circuit relied primarily on Comment 9(c)(1)–3, which states in relevant part that "a notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change . . . [i]f there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default." This exposition of the regulation does not add any clarity to the regulatory text, which expresses the same requirement. See §226.9(c)(1) (2008) ("[I]f a periodic rate or other finance charge is increased because of the consumer's delinquency or default . . . notice shall be given . . . before the effective date of the change"). And like §226.9(c), Comment 9(c) is entitled "Change in terms." Accordingly, Chase's plausible interpretation of §226.9(c)(1) is equally applicable to Comment 9(c)(1)–3: On Chase's view, because the interest-rate increase at issue in this case did not constitute a "change in terms," the disclosure requirements in the regulation and Commentary simply do not come into play. See *supra*, at 10–11.

Comment 9(c)–1 is also ambiguous, though the most plausible reading supports Chase's position more than it does McCoy's. The Comment begins: "No notice of a change in terms need be given if the specific change is set forth initially" in the agreement. We do not find that the Comment's addition of the modifier "specific" to the word "change" enables us to determine, any more than we could in light of the text of the regulation, see *supra*, at 12, whether the interest-rate increase at issue in this case was a "change in terms" requiring notice. According to Chase, as long as the agreement explains that delinquency

——————

issue authoritative interpretations for other purposes.

or default might trigger an increased interest rate and
states the maximum level to which the rate could be in-
creased, the "specific change" that ensues upon default has
been set forth initially and no additional notice is required
before implementation. McCoy argues to the contrary:
Under Comment 9(c)–1, any new rate imposed after delin-
quency or default must be disclosed prior to the effective
date, if the particular rate (rather than the maximum
rate) was not specifically mentioned in the agreement. On
the whole, then, the Official Staff Commentary's explana-
tion of Regulation Z does not resolve the uncertainty in the
regulatory text, and offers us no reason to disregard
the interpretation advanced in the Board's *amicus* brief.[10]

---

[10] In concluding otherwise, the Ninth Circuit focused on the examples
Comment 9(c)–1 provides of changes that, if set forth initially, require
no further disclosure when put into effect:

"No notice of a change in terms need be given if the specific change is
set forth initially, such as: Rate increases under a properly disclosed
variable-rate plan, a rate increase that occurs when an employee has
been under a preferential rate agreement and terminates employment,
or an increase that occurs when the consumer has been under an
agreement to maintain a certain balance in a savings account in order
to keep a particular rate and the account balance falls below the
specified minimum."

The Ninth Circuit concluded that, in contrast to each of these three
examples, "the increase here occurs at Chase's discretion." 559 F. 3d
963, 966 (2009). That is, once the triggering event—McCoy's default—
occurred, Chase had the latitude to increase the interest rate as it saw
fit (up to the limit specified in the Pricing Schedule).

We are not persuaded by the Ninth Circuit's reasoning. Certainly,
under a "variable-rate" plan the interest rate fluctuates according to an
external variable easily discernable by the cardholder (like the Federal
Prime rate), and the issuer has no discretion. See *ibid.* But the Com-
ment's second and third examples do not appear to be significantly
different from this case: The agreement contains a preset rate, but it
also provides that, on the occurrence of a predefined event (terminating
employment or a low account balance), the rate will increase.

Moreover, Comment 9(c)–1 further states that notice is needed "if the
contract allows the creditor to increase the rate at its discretion but
does not include specific terms for an increase"—for example, "when an

McCoy further contends that our reliance here on an agency interpretation presented outside the four corners of the Official Staff Commentary will require future litigants, as well as the Board, to expend time and resources "to comb through . . . correspondence, publications, and the agency's website to determine the agency's position." Brief for Respondent 37–38. We are not convinced. McCoy may be correct that the Board established the Official Staff Commentary so as to centralize its opinion-making process and avoid "overburdening the industry with excessive detail and multiple research sources." 46 Fed. Reg. 50288. But his suggestion that, if we accord deference to an *amicus* brief, all other "unofficial" sources will be fair game is of no moment. Today we decide only that the *amicus* brief submitted by the Board is entitled to deference in light of "the circumstances of this case." *Auer*, 519 U. S., at 462.

Accordingly, we conclude that, at the time of the transactions at issue in this case, Regulation Z did not require Chase to provide McCoy with a change-in-terms notice before it implemented the Agreement term allowing it to raise his interest rate following delinquency or default.

\*    \*    \*

For the foregoing reasons, the judgment of the United States Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

—————

increase may occur under the creditor's contract reservation right to increase the periodic rate." It would seem that the narrower latitude Chase had under the Agreement to set the precise new rate within a specified range after McCoy defaulted is not the kind of "discretion" the last example of Comment 9(c)–1 contemplates. In short, analogizing to the Comment's examples suggests that Chase's action in setting a new rate was most likely a "specific change" that the Agreement itself contemplated, and subsequent disclosure was not clearly required.