Filed 2/23/15; pub. order 3/17/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASHLEY TAMAS,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>SAFEWAY, INC. et al.,<br><br>  Defendants and Respondents. | G050114<br><br>(Super. Ct. No. RIC1206341)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Daniel A. Ottolia, Judge.  Affirmed.

Ridout Lyon + Ottoson, Christopher P. Ridout, Caleb LH Marker; Zimmerman Reed and Bradley C. Buhrow for Plaintiff and Appellant.

Fulbright & Jaworski, Jeffrey B. Margulies, William L. Troutman and Margot M. Fourqurean for Defendants and Respondents.

\*          \*          \*

Ashley Tamas appeals from the judgment entered in favor of defendants Safeway, Inc. and Lucerne Foods, Inc. (collectively Safeway) after the trial court sustained a demurrer to Tamas' proposed class action complaint without leave to amend. In her complaint, Tamas alleged Safeway was culpable for misbranding its Lucerne brand of Greek yogurt as "yogurt" because the food's ingredients included "milk protein concentrate" (MPC), which is not included on the list of allowable optional ingredients for "yogurt" under the applicable regulation promulgated by the federal Food and Drug Administration (FDA). The trial court disagreed, concluding that MPC was an allowable ingredient in yogurt, as the restrictive regulation relied upon by Tamas had been stayed, and the FDA had informally agreed to allow the use of MPC in yogurt until the stay was resolved.

We affirm. The regulation relied upon by Tamas to preclude the use of MPC in yogurt is one that she admits was stayed by the FDA shortly after it was enacted, in response to concerns the rule was unduly restrictive. The glacial pace at which the FDA has moved in attempting to resolve those concerns and redraft a new formal regulation did not, as Tamas seems to suggest, operate as a stealth reenactment of the stayed rule.

FACTS

Tamas filed her complaint in April 2012, on behalf of herself and a class of similarly situated consumers who have purchased "Lucerne Greek yogurt" from Safeway stores, believing it was "classic Greek yogurt" which achieves its thicker consistency and high protein content as a result of straining. She alleged Safeway had misbranded its "Lucerne Greek yogurt" as yogurt, because the product's listed ingredients include MPC, which was used as an artificial thickener, and to increase its protein content, but is not an ingredient permitted in any product labeled as "yogurt."

2

Specifically, Tamas alleged the FDA has promulgated a regulation specifying the "Standard of Identity" (SOI) for yogurt. This SOI sets forth the definition of "yogurt" and follows it with a restrictive list of the ingredients that may be included within any product labeled as "yogurt." She also alleged that pursuant to the federal Nutrition Labeling and Education Act of 1990, the states are preempted from adopting their own standards for food labeling which are inconsistent with the federal SOI. Thus, California has adopted the federal SOI for yogurt as California's own pursuant to the Sherman Food, Drug, and Cosmetic Law (Health & Saf. Code, § 109875, et seq.)

As set forth in Tamas' complaint, the SOI for yogurt describes yogurt as being made by "culturing one or more of the optional diary [sic] ingredients [cream, milk, partially skimmed milk, or skim milk, used alone or in combination]" and allows the addition of "[o]ne or more of the other optional ingredients specified in paragraphs (b) [referring to allowable vitamins] and (d) of this section."

Tamas notes that paragraph (d), in turn, specifies the "other optional ingredients" which may be included in yogurt, including "[c]oncentrated skim milk, nonfat dry milk, buttermilk, whey, lactose, lactalbumins, lactoglobulins, or whey modified by partial or complete removal of lactose and/or minerals, to increase the nonfat solids content of the food." As Tamas alleges, MPC is not included on that list. (21 C.F.R. § 131.200(d)(1) (2014) (all further regulatory references are to this title of the Code of Federal Regulations.)

Tamas also acknowledges that subparagraph (d)(1) of the yogurt SOI, which lists the foregoing "other optional ingredients" that may be included in the product, has been stayed since 1982. She alleges, however, that the effect of that stay was to *further restrict* the ingredients allowed in yogurt, such that even those ingredients listed in the stayed subparagraph (which would otherwise be allowed) are prohibited.

Thus, under Tamas' construction of the SOI for yogurt, MPC is not currently a permitted ingredient in any food labeled as "yogurt." Consequently, she

alleges Safeway misbranded its "Lucerne Greek yogurt" as yogurt, and based on that allegation she stated causes of action for violation of the Consumers Legal Remedies Act (Civ. Code, § 1750, et seq.) and violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200, et seq.). Tamas prayed for a court order declaring that Safeway had misbranded its "Lucerne Greek yogurt" product as "yogurt," an injunction prohibiting Safeway from continuing to sell their product as "yogurt," and an award of restitution.

Safeway demurred to the complaint. It acknowledged using MPC in its "Lucerne Greek yogurt," but denied that doing so was prohibited by the partially stayed SOI. Specifically Safeway disputed Tamas' contention that the FDA's 1982 stay of the "other optional ingredients" provision of the yogurt SOI operated as a further restriction on the ingredients allowed in yogurt. Instead, Safeway contended that the stay of section 131.200, para. (d)(1) operated to *lift* that restriction on "other optional ingredients," leaving it free to include MPC as an ingredient and still call its product "yogurt."

In support of its demurrer, Safeway asked the court to take judicial notice of various federal regulations, FDA rulings contained in the federal register, and a memorandum summarizing questions and answers from a 2004 "Regional Milk Seminar, an Advanced Milk Processing Course and a Special Problems in Milk Protection Course" available on the FDA website. The court granted that request in its entirety.

Tamas opposed the demurrer, and asked the court to take judicial notice of various documents as well. The court granted this request in part, and denied it in part.

After considering the arguments, as well as the documents of which it took judicial notice, the court sustained the demurrer without leave to amend.

4

DISCUSSION

1. *Standard of Review*

On review of a judgment following an order sustaining a demurrer without leave to amend, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Pich v. Lightbourne* (2013) 221 Cal.App.4th 480, 490.)

2. *The Federal SOI for Yogurt*

The SOI for yogurt, which became effective in 1981 (46 Fed.Reg. 9939, (Jan. 30, 1981)), is contained in section 131.200. It describes yogurt as "the food produced by culturing one or more of the optional dairy ingredients specified in paragraph (c) of this section with a characterizing bacterial culture that contains the lactic acid-producing bacteria, Lactobacillus bulgaricus and Streptococcus thermophilus." It

5

also allows "[o]ne or more of the other optional ingredients specified in paragraphs (b) and (d) of this section [to] be added." (§ 131.200(a) (2014).)

The "dairy ingredients" that can be *cultured* to make yogurt are "[c]ream, milk, partially skimmed milk, or skim milk, used alone or in combination." (§ 131.200(c) (2014).) These allowable cultured ingredients listed in paragraph (c) of the SOI are sometimes referred to as the "basic milk ingredients" of the yogurt. (74 Fed.Reg. 2443, 2453, (Jan. 15, 2009).)

Paragraph (b) of the SOI allows the addition of vitamins A and D. And the "[o]ther optional ingredients" that can be used in yogurt, listed in paragraph (d) of the regulation include "(1) Concentrated skim milk, nonfat dry milk, buttermilk, whey, lactose, lactalbumins, lactoglobulins, or whey modified by partial or complete removal of lactose and/or minerals, to increase the nonfat solids content of the food . . . . [¶] (2) Nutritive carbohydrate sweeteners. . . . [¶] (3) Flavoring ingredients. [¶] (4) Color additives. [¶] (5) Stabilizers. (§ 131.200(d)(1) (2014).)

*3. The FDA's Stay of the "Other Optional" Dairy Ingredient Provision of the SOI*

The FDA's enactment of the yogurt SOI followed its 1977 publication of a *proposed* SOI, which was somewhat less restrictive. (42 Fed.Reg. 29919, (June 10, 1977).) Under the proposed rule, the "other optional" *dairy* ingredients which could be added to the basic cultured dairy ingredients to make yogurt included "[c]oncentrated skim milk, nonfat dry milk, *or other milk-derived ingredients.*" (*Id.* at p. 29924.) However, some of the public comments about the proposed rule included objections to the breadth of the phrase "other milk-derived ingredients" (46 Fed.Reg. 9924, 9927 (Jan. 30, 1981)), and after considering those objections, the FDA chose to incorporate a specific list of acceptable "milk-derived" ingredients which could be added to yogurt into the SOI, rather than rely upon the broader category originally proposed.

But when the FDA published the new SOI for yogurt, it again expressly invited public comment, giving "[i]nterested persons . . . until March 2, 1981, to file objections and request a hearing on the final rule." (See 21 U.S.C. § 371(e)(1) [allowing either the FDA or any interested member of the public to propose an amendment or repeal of an SOI.].) Title 21 United States Code section 371 also specifies that when such a proposal is made, the FDA "shall afford all interested persons an opportunity to present their views thereon, orally or in writing." (*Ibid.*) Then, if timely objections are filed, they "operate to stay the effectiveness of those provisions of the order to which the objections are made. As soon as practicable after the time for filing objections has expired the Secretary shall publish a notice in the Federal Register specifying those parts of the order which have been stayed by the filing of objections and, if no objections have been filed, stating that fact." (*Id*. at subparagraph (e)(2).)

In this case, "twenty-one responses were filed objecting to specific provisions of the final rule and in most cases requesting a hearing." (74 Fed.Reg. 2443 (Jan. 15, 2009).) According to the FDA, objectors focused on the provision of the SOI which "*restrict[s] the kinds of safe and suitable milk-derived ingredients that may be used as optional ingredients* to increase the nonfat solids contents of these foods," (47 Fed.Reg. 41519 (Sept. 21, 1982), italics added) which it characterized as having "*replac[ed] the phrase 'other milk-derived ingredients'* [in the proposed rule] *with a limited list of names of milk-derived ingredients . . . .*" (*Ibid*, italics added.) The FDA explained that some objectors had claimed this change "does not promote honesty and fair dealing in the interest of consumers because this interpretation of the phrase bars the use of other safe, nutritional, and functional milk-derived ingredients. . . . The objections also maintain that a definition of the phrase 'other milk-derived ingredients' should be established at a hearing." (*Ibid.*) The FDA acknowledged "that the objectors raise a genuine and substantial issue of fact that must be resolved at a public hearing as provided for in 21 CFR 12.24." (*Ibid.*)

7

Thus, in accordance with title 21 United States Code section 371(e), the FDA announced it was "staying the effective date of the provisions . . . pending the outcome of a public hearing." (47 Fed.Reg. 41519 (Sept. 21, 1982).)

The public hearing was long delayed, and in 2004, the FDA published a memorandum containing questions and answers from a recent "Regional Milk Seminar," and later made that memorandum available on its website. Among the questions posed was whether MPC could "be used as [an] ingredient[] in yogurt to increase the nonfat solids content?" The answer provided was "Yes. 21 CFR 131.200(d), which would have precluded . . . MPC use, was one of several provisions of the standard of identity for yogurt that were stayed in 1982 . . . ."

In January 2009 – nearly *27 years* after announcing the stay – the FDA acknowledged its very lengthy delay in scheduling that public hearing, explaining that "[t]o date, due to competing priorities and limited resources, FDA has not held a public hearing to resolve these issues and the effective date for these provisions remains stayed. *Therefore, these provisions were never in effect. Consequently, cultured milk and yogurts may deviate from the relevant standards in the previously mentioned respects.*" (74 Fed.Reg. 2443 (Jan. 15, 2009), italics added.)

The FDA then proposed a new rule amending the SOI for yogurt in several respects. (74 Fed.Reg. 2443 (Jan. 15, 2009).) To date, the FDA has not formally adopted that, or any other, amended SOI for yogurt, and the previously announced stay remains in effect.

*4. The FDA's Power to Stay a SOI*

The FDA's authority to stay the effectiveness of a SOI, in whole or in part, is grounded in title 21 United States Code section 371(e)(2), which provides for a stay of an order if a person who is adversely affected by it "file[s] objections thereto . . . stating the grounds therefor, and requesting a public hearing upon such objections." In this case,

8

the FDA specifically solicited such objections when it announced the yogurt SOI. Then, "[u]ntil final action upon such objections is taken by the Secretary under paragraph (3), the filing of such objections shall operate to stay the effectiveness of those provisions of the order to which the objections are made." (*Ibid*.)

Tamas does not dispute the FDA has that power. Instead, the question posed in this appeal is *the effect* of the FDA's decision to impose such a stay on one part of a SOI, while otherwise leaving that SOI intact. The parties' positions can be summed up as follows: Safeway argues that when the FDA stays the effectiveness of *part of a restrictive SOI*, the result is a rule that is only *partially restrictive*. Tamas' belief is that because the very nature of a SOI is to set forth the allowable ingredients in a specified product – and to restrict the use of any ingredients not specified within the rule – the stay of any provision which identifies some of those acceptable ingredients can only create *a further restriction*. In Tamas' view, once a formal SOI has been enacted, the only way to relax its restrictions would be to formally repeal it or formally enact a new, less restrictive SOI.

In the abstract, we conclude Safeway has the better of this argument. If Tamas' view were accepted, the FDA's undisputed power to stay a SOI *in its entirety* would result in a complete prohibition on the manufacture of the specified product. No ingredients would be allowed.

*5. The Trial Court did not Err by Relying on Statements by the FDA in Construing the Effect of its Partial Stay of the Yogurt SOI.*

Tamas argues the trial court erred by relying on the FDA's own statements interpreting the SOI in its current form. Her first contention is that the statements must be disregarded because they "are wholly inconsistent with the plain language of the [SOI]." But the contention is a red herring. The disputed issue in this demurrer had nothing to do with interpreting *the language* of the SOI. Instead, the issue to be decided

was the effect of the FDA's *partial stay* of that SOI. While the former might be entirely clear, the latter is not.

Significantly, the FDA's partial stay of the yogurt SOI was not accomplished by any specific amendment of its language. The FDA did not parse the words of the SOI in an effort to create a different SOI. Thus, the usual rules we might employ to conduct our own parsing of the resulting words, to ascertain the "plain meaning" of the newly constituted SOI, are not helpful. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [describing the "'plain meaning' rule"]; *Watt v. Alaska* (1981) 451 U.S. 259, 265 [101 S.Ct. 1673, 68 L.Ed.2d 80] [noting that "'[the] starting point in every case involving construction of a statute is the languageitself'"].)

Instead, the FDA simply *described* the impact of its decision, which also encompassed the SOI's of other specified dairy products, as "staying the effective date of the provisions . . . that restrict the kinds of safe and suitable milk-derived ingredients that may be used as optional ingredients to increase the nonfat solids contents of these foods . . . ." (47 Fed.Reg. 41519 (Sept. 21, 1982).)

Thus, the real issue before us is what the FDA meant to accomplish when it imposed that partial stay – did it mean to relax the restrictions on "other optional" dairy ingredients contained in the yogurt SOI, or tighten them further? It is that uncertainty, rather than any disagreement about *the language* of the SOI, which renders the SOI ambiguous in the wake of the partial stay. Consequently, the subsequent comments of the FDA, explaining the effect of its imposition of the partial stay, are pertinent to the resolution of that resulting ambiguity. (*Chase Bank USA, N.A. v. McCoy*, (2011) 562 U.S. 195 [131 S.Ct. 871, 178 L.Ed.2d 716] [when a regulation is ambiguous, the court will defer to the agency's own reasonable interpretation]; (*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council* (2009) 557 U.S. 261, 283-284 [129 S.Ct. 2458, 174 L.Ed.2d 193] (*Coeur Alaska*).)

10

Moreover, in *Coeur Alaska*, the Supreme Court also disposed of Tamas' more specific contention that the trial court also erred by considering "informal" statements of the FDA in determining the effect of the partial stay, such as the 2004 memorandum summarizing questions and answers from the "Regional Milk Seminar, an Advanced Milk Processing Course and a Special Problems in Milk Protection Course," which was made available on the FDA website. In *Coeur Alaska*, one of the things the Supreme Court itself relied upon to discern the "agency interpretation and agency application of the regulations" (*Coeur Alaska, supra,* at p. 283) was a memorandum written by one agency official to another. In doing so, the court explained that "[t]he Memorandum, though not subject to sufficiently formal procedures to merit *Chevron* [*U.S.A. Inc. v. National Resources Defense Council, Inc.* (1984) 467 U.S. 837, [104 S.Ct. 2778, 81 L.Ed.2d 694] deference, [citation] is entitled to a measure of deference because it interprets the agencies' own regulatory scheme." (*Id*. at pp. 283-284.)

That same analysis applies here. There is no requirement that all food products be formally defined by a SOI. Instead, the Secretary of Health and Human Services, who acts through the FDA in these matters (21 U.S.C. § 393(d)(2)), has the sole authority to determine not only the content of a SOI, but also *whether to impose one* for a particular product. (21 U.S.C § 341, ["Whenever in the judgment of the Secretary such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity."]) Thus, where the parties' dispute the effect of the FDA's decision to stay provisions of a SOI it previously enacted, it is appropriate for the court to consider even "informal" statements of the FDA in assessing that effect.

*6. The Yogurt SOI, in its Partially Stayed Form, Does not Exclude MPC as an "Other Optional" Dairy Ingredient.*

Tamas' main complaint, of course, is that the trial court erred by concluding that the FDA's partial stay of the yogurt SOI effectively relaxed the SOI's restriction on the "other optional" dairy ingredients that could be used in yogurt. Although it is clear from the FDA's own statements that it *intended* the stay to achieve just this result – having been persuaded by public comments that the specific listing of allowable "other optional" dairy ingredients in the SOI was likely too restrictive – Tamas appears to be arguing its mere imposition of a stay could not actually achieve such a result.

Tamas makes much of the idea that a SOI is always "exclusionary in nature," and "'framed as *to exclude substances not mentioned in the definition.*'" (Quoting *Federal Security Administrator v. Quaker Oats, Co.* (1943) 318 U.S. 218, 232 [63 S.Ct. 589, 87 L.Ed. 724] (*Quaker Oats*).) Applying that premise, she contends that once a product SOI has been adopted, any substance not mentioned in that SOI is prohibited in the product – and that the prohibition lasts *until such time as a new SOI, incorporating the previously excluded substance among the approved ingredients, is formally adopted.* Consequently, she contends that because the FDA has never formally adopted *a new SOI* for yogurt, which allows MPC to be used, it remains prohibited – stay or no stay. The argument is flawed, and we reject it.

The problem with Tamas' argument is it relies on the unstated premise that the FDA actually has *no authority* to stay the effectiveness of a formally enacted SOI, which is what it claims to have done in this case. To be clear, she does not directly challenge the FDA's authority to impose a stay, although she seemingly implies as much when she points out that "[a] SOI can only be established, amended or repealed by following the specific procedures set forth in 21 U.S.C. § 371(e)(1-3)." Rather, she

12

simply argues that the FDA's imposition of a stay would be *ineffective* to relax the strictures of the SOI, which she views as binding once enacted.

However, Tamas offers no authority to support this contention. The case she primarily relies upon, *Quaker Oats*, can in no way be construed as imposing any limit on the authority of the FDA to act in connection with SOI's. To the contrary, the case emphasizes, rather than diminishes, the authority of the FDA in this realm. (*Quaker Oats, supra,* 318 U.S. at p. 227 ["[t]he Act does not contemplate that courts should thus substitute their own judgment for that of the Administrator"].) Nor does Tamas cite any statute or regulation which suggests the FDA is without authority to stay the effectiveness of one of its own SOI's pending a further public hearing.

And because the FDA clearly believes that staying the effectiveness of one of its own SOI's is an available tool in its regulatory arsenal, we will defer to its reasonable judgment in the absence of statutory authority to the contrary. (*Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., supra*, 467 U.S. at p. 865.)

Once we recognize the FDA does have the authority to stay the effectiveness of one of its own SOI's, then we must accept its clear – and undisputed – pronouncement that it intended to do just that with respect to the yogurt SOI. Moreover, the FDA's own justification for imposing that stay – which it described as a response a "genuine and substantial" concern that the SOI's restrictive list of "other optional" dairy ingredients unfairly "bars the use of other safe, nutritional, and functional milk-derived ingredients" (47 Fed.Reg. 41519 (Sept. 21, 1982)), makes clear that its goal in doing so was to relax that restriction, rather than to tighten it further. Finally, Tamas' own description of the purpose of an SOI supports this result as well. If the goal of enacting a SOI is always *exclusionary* in nature, as Tamas contends, then staying that same SOI, either wholly or in part, would logically operate to *eliminate or relax* that same exclusion.

Tamas' alternative arguments fare no better. She claims that because the FDA's 2009 proposal for a new yogurt SOI "proposed *to permit"* the use of ingredients

13

such as MPC in yogurt (italics added), it implicitly confirmed that no such permission was *currently* in effect. But thus argument simply ignores the fact that the operative provision of the current SOI, which would otherwise have *excluded* MPC as an "other optional" dairy ingredient in yogurt, has been stayed. So while it might be accurate to say that the FDA has not *explicitly* permitted any "other optional" dairy ingredients to be included in yogurt, it would be equally accurate to say the FDA is not currently *excluding* any either. And since it is Tamas who is relying upon the SOI to *exclude* MPC as an allowable "other optional" dairy ingredient in yogurt, the FDA's stay of the relevant provision of that SOI dooms her claim.

Tamas also claims that the FDA itself noted "it would be a 'mistake'" to believe that the effect of its partial stay of the yogurt SOI is "to permit a broader group of ingredients under that provision of the SOI." However, her argument confuses the provision regulating "other optional" dairy ingredients – which was stayed – with the provision which regulates "basic" dairy ingredients; i.e., those which can be cultured to make yogurt. In 2009, the FDA "clarifie[d] that the . . . list of basic milk ingredients in paragraph (c) of the current yogurt standard was not among the provisions that were stayed." (74 Fed.Reg. 2443, 2453 (Jan 15, 2009), italics added.)

Thus, the provision of the SOI which specifies that only "[c]ream, milk, partially skimmed milk, or skim milk, used alone or in combination" (§ 131.200(c)) may be used as the basic ingredient which can be cultured into yogurt is still operative, and the SOI still prohibits the use of MPC for that purpose. Thus, if Safeway's yogurt had relied on MPC as its *basic dairy ingredient* – as is the apparent case with the Kroeger "cultured . . . dairy blend" product cited by Tamas in her brief  – then calling the product "yogurt" would violate the exclusivity imposed by the *unstayed portion* of the SOI. But if MPC is merely an "additive" falling under the stayed paragraph (d) of the SOI – as is alleged by Tamas in this case – then its use is not currently prohibited.

14

Finally, Tamas asserts that the FDA's own explanation that its stay of the "other optional" dairy ingredients provision of the SOI meant that provision was "'never in effect,'" somehow undermines the ability of yogurt manufacturers to claim the FDA "ha[s] permitted  MPC all along."  We cannot agree.  Again, accepting Tamas' characterization of SOI's as exclusionary in nature means that the *absence* of such a provision (or one which "was never in effect") would necessarily imply the *absence of exclusion*, and could thus be fairly characterized as reflecting the FDA's implicit permission to use any suitable ingredient which might otherwise be governed by that provision.

## 7.  Tamas' Policy Argument Fails

Finally, Tamas claims there are good policy reasons for prohibiting the use of MPC in yogurt, including that there is no formal definition or SOI for what qualifies as MPC.  She points out that even the FDA has acknowledged, in 2005, that there is an "inconsistency with which the term MPC is used."  (See 70 Fed.Reg. 60751, 60764 (Oct. 19, 2005) [addressing pros and cons of allowing "ultra filtered" milk to be used in cheese].)  She also suggests MPC is favored by some manufacturers because it is a "low cost" way to increase the protein level of a product, and thus is useful to "boost a manufactuer's profit."

However, the mere fact there are valid reasons why MPC might be excluded from the list of allowable ingredients in yogurt does not mean it *is* excluded.  In fact, the points Tamas raises sound like just the sort of concerns that are intended to be hashed out before the FDA, as part of its seemingly complicated analysis of which ingredients should be included (or excluded) in a newly enacted yogurt SOI.  For all we know, it is the struggle to formulate a definition of MPC, so that it can be officially included on the allowable list, which has held up scheduling of the long anticipated public hearing on the yogurt SOI.  And perhaps allowing manufacturers to use MPC in

yogurt would mean some will produce a *lower cost* (as opposed to *higher profit*) product. But these are not issues for this court to resolve. If there is one thing that is absolutely clear in this case, it is that assessing the relative benefits and detriments of allowing MPC to be used as an additive in yogurt is an issue that will have to be decided by the FDA. (*Quaker Oats, supra*, 318 U.S. at p. 227.)

DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

16

Filed 3/17/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASHLEY TAMAS, | |
| Plaintiff and Appellant, | G050114 |
| v. | (Super. Ct. No. RIC1206341) |
| SAFEWAY, INC. et al., | ORDER DENYING PETITION FOR REHEARING AND GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |

The petition for rehearing is DENIED.

Defendant and Respondent Safeway, Inc. requested that our opinion filed on February 23, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J