**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RANDAL ANDERSEN; QUIN ARNOLD;
GILBERT ARTER; JAMES DEWEY
ASHBY, JR.; LYNN BATAYOLA;
CAROL BLANKFIELD; DAVID A.
BOOZER; SHARON ANN BRAUN,
AKA Sharon Ann Sanders; DAVID
BRENT; JACQUELINE BROWN;
RANDY BUCHANAN; LORETTA
BUCKHOLZ; ROBERT CASSIDY;
THOMAS CLARK; TRACY CLARK;
LAURA COCHRANE; PATRICK
CURRY; WALLACE DANIELSON;
KRISTEN DELARA; SHARON
DENISON; WILLIAM DENTON; JOSEPH
DINICOLA; BARBARA DREISOW;
BRENDA DREISOW, Estate of; JYL
EIDEMILLER; ELAINE ELLISON; LYNN
EPSTEIN; ELIZABETH FIELDS;
ROBERT FORST; CRAIG FUNCKE;
CAROLYNE GARRIS; THOMAS
GLADIS; STEVEN HALL; GERARD
HEMPSTEAD; MICHELLE
HIGHTOWER; RICHARD HOBT;
JUDITH KENNEDY; LYNN KNIGGE;
JENNIFER KRAUSE; GLORIA
MACINNIS; DEBORAH MAHANAY;
CAROL MANESS; DIANE MCCARTY;
JUNE MCGARVEY; STEVEN MEHL;
MEEGAN MOUTSAKAS; MARK NEILS;

No. 12-36051

D.C. No.
2:12-cv-00439-
MJP

OPINION

JUDI O'HURLEY; DIANE ORMSTON;
LINDA PATCHELL; GLORIA PRINCE;
LYNN RAMSEY; CAROL RUDISUHLE;
JOYCE S SEIFERT; ROBERT SEVERINI;
ERNEST SHARPE; MICHAEL SHEA;
PAMELA SPRING; KATHRYN
TERLIZZI; ANTHONY THOMAS;
DOUGLAS THOMAS; PAMELA JEAN
THOMAS; JOHN VOGLER; KATHERINE
M. WAGGONER; MICHAEL WARD;
ROB WILDER; STEVEN WILLIAMS;
LESLIE WILLMAN; JOANNE WIND;
DEBRA ANN WINTER; NANCY
WRIGHT; DELOIS WYATT; ROXANNA
ZABORAC,
                  *Plaintiffs-Appellants*,

                    v.

DHL RETIREMENT PENSION PLAN;
DPWN HOLDINGS (USA), INC.; DHL
PENSION PLAN COMMITTEE, AKA
Employee Benefits Pension Plan
Committee of DPWN Holdings
(USA) Inc.,
                  *Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued November 8, 2013

Submitted September 8, 2014
Seattle, Washington

Filed September 15, 2014

Before: Mary M. Schroeder, Richard A. Paez,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

**Employee Retirement Income Security Act**

Affirming the district court's dismissal of an action under the Employee Retirement Income Security Act, the panel held that defendants' decision to eliminate plaintiffs' right to transfer their account balances from a defined contribution plan to a defined benefit plan did not violate ERISA's anti-cutback rule.

The anti-cutback rule prohibits any amendment of an employee benefits plan that would reduce a participant's "accrued benefit." Plaintiffs were former employees of Airborne Express, Inc., who participated in both Airborne's defined benefit pension plan and its defined contribution plan. The defined benefit pension plan was a floor-offset plan. That is, its benefits were calculated on the basis of a participant's final average compensation and years of service,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with an offset for any account balance in the defined contribution plan. Before the challenged amendment, participants could transfer the funds from their defined contribution plan accounts to the defined benefit plan's general pool before the participant's benefits were calculated. DHL acquired Airborne and merged the two companies' retirement plans, amending the benefit plan to eliminate participants' right to transfer funds into that plan.

The panel agreed with the district court and the First Circuit that the amendment did not violate the anti-cutback rule, but it took a different path in reaching that conclusion. The panel deferred to the amicus brief of the government insofar as it interpreted Treasury Regulation A–2, which provides that, without violating the anti-cutback rule, a plan may be amended to eliminate provisions permitting the transfer of benefits between and among defined contribution plans and defined benefit plans. The panel also gave some weight to the government's statutory interpretation. The panel held that the anti-cutback rule was not violated because the plan amendment did not reduce a participant's accrued benefit in either the defined contribution plan or the defined benefit plan. The panel declined to decide whether the elimination of the transfer option was a "cutback" because the transfer option was an "optional form of benefit" under the anti-cutback rule. The panel concluded that if the transfer option were an optional form of benefit, then it would fall within the regulatory exception.

## COUNSEL

Robert S. Catapano-Friedman (argued), The Catapano-Friedman Law Firm, Albany, New York; Michael E. Withey, Law Offices of Michael E. Withey, Seattle, Washington, for Plaintiffs-Appellants.

Brian T. Ortelere (argued) and Jeremy P. Blumenfeld, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania; Nicole A. Diller, Morgan, Lewis & Bockius LLP, San Francisco, California; Michael P. Monaco, Song Mondress PLLC, Seattle, Washington, for Defendants-Appellees.

Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Principal Deputy Assistant Attorney General, Gilbert S. Rothenberg, Teresa E. McLaughlin, and Ivan C. Dale, Attorneys, Tax Division, United States Department of Justice, Washington, D.C., for Amicus Curiae United States.

## OPINION

BERZON, Circuit Judge:

The "anti-cutback" rule of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1054(g), prohibits any amendment of an employee benefits plan that would reduce a participant's "accrued benefit." Our question is whether Defendants' (collectively, "DHL") decision to eliminate Plaintiffs' right to transfer their account balances from DHL's defined contribution plan to its defined benefit plan violated the rule. We hold it did not.

## I.

Plaintiffs are former employees of Airborne Express, Inc. ("Airborne") who participated in both Airborne's defined benefit pension plan ("the Retirement Income Plan") and its defined contribution plan ("the Profit Sharing Plan").[1] The Retirement Income Plan is a so-called floor-offset plan. That is, its benefits are calculated on the basis of a participant's final average compensation and years of service, with an offset for any account balance in the Profit Sharing Plan.

A floor-offset feature works as follows:

> The employee's annual benefit in the defined benefit pension — the floor — is offset by the annual annuity value of the [defined] contribution plan. (The annual annuity value of a defined contribution plan . . . is the dollar amount available each year if the account balance at retirement were used to purchase an annuity, using standard assumptions for interest rates and life expectancy.) . . . .

> Essentially, a . . . guaranteed benefit level is established in the defined benefit plan — based on age, service and/or compensation. If

---

[1] "A defined contribution plan is one where employees and employers may contribute to the plan, and the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide. . . . A defined benefit plan . . . consists of a general pool of assets rather than individual dedicated accounts. Such a plan, as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (citations and quotation marks omitted).

the annuity value of the defined contribution plan is equal to or greater than the guaranteed level of the [defined benefit] plan, all of the benefit will come from the [defined contribution] plan. However, if the annuity value of the account balance of the [defined contribution] plan is less than the guaranteed benefit of the [defined benefit] plan, the [defined benefit] plan will make up the difference.

U.S. Dep't of Labor, Bureau of Statistics, Employee Benefits Survey, *People Are Asking . . . What is a floor-offset plan?*, http://bls.gov/ncs/ebs/peopleboxfloorpl.htm (last modified May 9, 2002). If, for example, a participant was entitled to receive $5,000 in monthly benefits under the Retirement Income Plan but had a balance in the Profit Sharing Plan that would equate to a $3,000 monthly annuity, he would receive a monthly benefit of $2,000 from the Retirement Income Plan. If his balance in the Profit Sharing Plan would equate to a $6,000 monthly annuity, he would receive nothing from the Retirement Income Plan.

Before the amendment challenged here, participants could transfer the funds from their Profit Sharing Plan accounts to the Retirement Income Plan's general pool before the participant's benefits were calculated. The transfer option was described in section 7.11 of Airborne's Retirement Income Plan:

A Participant may transfer his/her nonforfeitable Employer Profit Sharing Plan account balance to this Plan in order to be

paid an annuity benefit from such transferred
account balance.

This transfer option, if exercised, provided increased funds
for the Retirement Income Plan. It also allowed participants
to drop their Profit Sharing Plan balances to zero, eliminating
any offset when the benefit payable from the Retirement
Income Plan was calculated. So, in the first example
provided above, if a participant transferred the entire balance
of his Profit Sharing Plan account to the Retirement Income
Plan when he retired, he would be entitled to (at least) the full
$5,000 monthly annuity from the Retirement Income Plan;[2]

---

[2] Plaintiffs have described the effect of the transfer as *reducing* the offset
to zero, rather than *increasing* the amount of the benefit payable under the
Retirement Income Plan. DHL has not disputed this characterization. The
plain text of the Retirement Income Plan suggests otherwise. Section 7.11
provides, in full:

> [a] Participant may transfer his/her nonforfeitable
> Employer Profit Sharing Plan account balance to this
> Plan *in order to be paid an annuity benefit from such
> transferred account balance*. If a Participant elects to
> transfer his/her nonforfeitable Employer Profit Sharing
> Plan account balance to this Plan, the benefit payable to
> the Participant shall be the Actuarial Equivalent,
> pursuant to Section 4.01C (as determined under this
> Plan), of the value of the Employer's Profit Sharing
> Plan account balance as transferred to this Plan for such
> Participant.

This provision strongly suggests that the amount of a participant's annuity
benefit under the Retirement Income Plan varied depending on the value
of the Profit Sharing Account balance transferred into the Retirement
Income Plan. As the exact mechanism by which the transfer affects the
Retirement Income Plan annuity value is not material to our decision, we
need not resolve the apparent discrepancy between the parties' assertions
and the terms of the plan.

he would, of course, have nothing remaining in his Profit Sharing Plan account, and would therefore be paid nothing from that account.[3]

In 2003, DHL acquired Airborne and began a process of merging the two companies' retirement plans. All relevant features of Airborne's plans were preserved in the merger, with one exception: on December 31, 2004, DHL eliminated the right of participants to transfer their account balances from the Profit Sharing Plan to the Retirement Income Plan. It did so by amending section 7.11 of the Retirement Income Plan to "add[] the following to the end thereof: Notwithstanding the foregoing, the [Retirement Income] Plan shall not accept transfers of any Profit Sharing Plan account balances after December 31, 2004." The Profit Sharing Plan was not amended; it continues to allow transfers to any eligible retirement plan that will accept them. As we discuss in Part III, due to differential actuarial assumptions used in the two plans, the elimination of the right to transfer these funds into the Retirement Income Plan caused many participants in the two plans to receive reduced overall periodic benefits.

*The* Tasker *litigation*. On February 11, 2009, former Airborne employee Jeffrey R. Tasker sued DHL alleging that the December 31, 2004 elimination of the transfer option violated ERISA's anti-cutback rule. Tasker's case is instructive in understanding the magnitude of the benefits

---

[3] As we explain below, whether exercising the transfer option was financially beneficial for any individual participant would depend on the value and performance of the investments in his Profit Sharing Plan account.

reduction Plaintiffs could experience as a result of the plan amendment:

> After more than thirty-two years of service, Tasker retired on March 4, 2004. As of the end of 2003, his [Profit Sharing Plan] balance was $370,338.22. At his retirement, he received a benefits estimate stating that his single life annuity under the [Retirement Income Plan] alone would be . . . $4,163.92 per month . . . if he transferred his [Profit Sharing Plan] balance into the [Retirement Income Plan]. Tasker selected . . . [that] option, to begin payments upon his request on or after October 1, 2008. In April 2008, Tasker learned . . . that his expected monthly benefits were approximately $2,200.00, not $4,163.92. . . . [T]he 2004 figure was higher because it contemplated Tasker's exercise of his transfer right — a right that was subsequently eliminated.

*Tasker v. DHL Ret. Sav. Plan*, No. 09-CV-10198-NG, 2009 WL 4669936, at *2 (D. Mass. Nov. 20, 2009), *aff'd*, 621 F.3d 34 (1st Cir. 2010).

The district court dismissed Tasker's complaint, holding that a United States Department of the Treasury regulation ("Regulation A–2") specifically permits the elimination of a transfer right, even when "such transfer may reduce or eliminate protected benefits." *Id.* at *5. Pursuant to Regulation A–2, the court concluded, a transfer right "may be eliminated without running afoul of the anti-cutback rule." *Id.* The First Circuit affirmed. *Tasker*, 621 F.3d at 40.

*The current action*.   On March 12, 2012, Plaintiffs brought this action against DHL, also alleging that DHL's elimination of the transfer option violated the anti-cutback rule.  The complaint alleges that "[s]ome of the Plaintiffs [who] have already applied for their pension benefits" were denied the right to transfer their Profit Sharing Plan account balances to the Retirement Income Plan, and "are now receiving . . . benefits of far less value than the amount to which they were fully vested and to which they were entitled."  Others have not yet applied for their benefits, but assume that their benefits will likewise "be substantially reduced because of [the] unlawful plan amendment."

The district court granted DHL's motion to dismiss the complaint, citing the First Circuit's analysis in *Tasker*.  Ten days later, Plaintiffs filed a motion for reconsideration asserting, inter alia, that the Secretary of the Treasury ("Secretary") exceeded his statutory authority in promulgating Regulation A–2.  The district court denied the motion, holding that "[n]either Rule 59(e) nor 60(b) of the Federal Rules of Civil Procedure permit reconsideration when a party simply fails to raise an argument it could have previously." It went on to state, however, that reconsideration would also be denied on the merits because "[i]t is not obvious that the Secretary's broad authority falls short of encompassing the regulation at issue here."  Plaintiffs filed a timely notice of appeal.

Following oral argument, we invited the United States Department of Labor and Department of the Treasury to submit an amicus curiae brief addressing whether DHL's "elimination of Plaintiffs' right to transfer their account balances from the defined contribution plan to the defined benefit plan violate[d] the anti-cutback rule . . . , where the

result of the elimination of the transfer option was significantly to decrease the periodic benefits paid from the defined benefit plan and in total." The government filed a brief answering that question in the negative and recommending that the panel affirm the district court. Plaintiffs filed a responsive brief.

We review de novo the district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## II.

ERISA's "anti-cutback rule is crucial to" the statute's "central[] . . . object of protecting employees' justified expectations of receiving the benefits their employers promise them." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743–44 (2004). "'Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits.'" *Id.* at 743 (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

The anti-cutback rule therefore provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1). It further establishes that "a plan amendment which has the effect of . . . eliminating an optional form of benefit, . . . shall be treated as reducing accrued benefits." *Id.*

§ 1054(g)(2)(B).[4]  ERISA, however, explicitly authorizes the Secretary to make exceptions to the anti-cutback rule's broad mandate:

> The Secretary of the Treasury shall by regulations provide that this paragraph shall not apply to any plan amendment which reduces or eliminates benefits or subsidies which create significant burdens or complexities for the plan and plan participants, unless such amendment adversely affects the rights of any participant in a more than de minimis manner.  The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B)[, concerning an "optional form of benefit"].

*Id*. § 1054(g)(2)(B).

The Internal Revenue Code contains a "substantially identical" provision, *Heinz*, 541 U.S. at 746, conditioning eligibility for tax breaks on a pension plan's compliance with ERISA's anti-cutback rule.  *See* 26 U.S.C. § 411(d)(6).[5]  The Secretary has "the ultimate authority to interpret these

---

[4] We discuss whether the transfer option was an "optional form of benefit" in Part II(C) of this opinion.

[5] Though the substance of the ERISA and Internal Revenue Code versions of the anti-cutback rule is the same, the numbering systems are different.  For example, Paragraph (1) in ERISA is Paragraph (A) in the Internal Revenue Code.  To avoid confusion, we cite to ERISA's anti-cutback rule.

overlapping anti-cutback provisions." *Heinz*, 541 U.S. at 747. Where "regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to" ERISA's version of the rule. *Id.*

Pursuant to his authority, the Secretary promulgated Regulation A–2, which addresses transfer rights:

> Q–2: To what extent may [anti-cutback rule] protected benefits under a plan be reduced or eliminated?
>
> A–2: . . . A plan may be amended to eliminate provisions permitting the transfer of benefits between and among defined contribution plans and defined benefit plans.

26 C.F.R. § 1.411(d)–4, Q & A–2(b)(2)(viii). Plaintiffs contend that although "the elimination of the transfer option . . . by itself did not violate the anti-cutback rule under [this] regulatory exception," the fact that the amendment resulted in a reduction of "the total monthly annuity amount guaranteed to pensioners" did violate the anti-cutback rule.

The First Circuit in *Tasker* and the district court in this case held that the plain language of Regulation A–2 foreclosed this argument. *Tasker* noted that "[t]he question posed [in this case] directly tracks Q–2 of the regulation: did the defendants violate the anti-cutback rule . . . by eliminating the transfer option, when that elimination had the incidental effect of significantly lowering the plaintiff's projected benefit?" 621 F.3d at 40. "The answer, a clear 'no,' directly tracks the teachings of A–2: [DHL may eliminate the transfer

right] even if that elimination reduces an accrued (but unclaimed) benefit." *Id*.

The district court in this case likewise reasoned that Regulation A–2 "can only logically be read to mean the regulation allowing the elimination of the ability to transfer funds contemplates that such a transfer may reduce or eliminate protected benefits." The district court held that Plaintiffs' interpretation — that Regulation A–2 allows elimination of a transfer benefit only if it results in no monetary reduction of retirement benefits — ignores the question posed by the regulation: "to what extent may . . . protected benefits . . . be reduced or eliminated?" 26 C.F.R. § 1.411(d)–4, Q–2.  For this reason, the district court agreed with the First Circuit that Regulation A–2 provides a "clear grant of safe passage for plan amendments that eliminate transfer options (even when the elimination may have the incidental effect of reducing benefits)." *Tasker*, 621 F.3d at 39.

We agree with the First Circuit and the district court here that DHL's 2004 plan amendment did not, as a matter of law, violate the anti-cutback rule.  But, with the guidance of the government's amicus brief, we take a different path in reaching that conclusion.  Additionally, we note below that although the result reached here is disturbing given the negative impact on Plaintiffs' periodic retirement benefits, that impact is primarily the result of the actuarial assumptions used by the Retirement Income Plan to calculate the offset, assumptions which have not been challenged.

**A.**

Before we proceed, we explain briefly our treatment of the government's amicus brief. Insofar as the government's brief interprets Regulation A–2, we defer to it. *See Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) ("[W]e defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997))). "[T]here is no reason to believe that the interpretation advanced by the [government] is a '*post hoc* rationalization' taken as a litigation position. The [United States] is not a party to this case," and it filed a brief only at our request. *Id.* at 881. "[T]here is," therefore, "no reason to suspect that the position the [government] takes in its *amicus* brief reflects anything other than the agency's fair and considered judgment as to what the regulation required at the time this dispute arose." *Id.*

We do not, however, afford the same level of deference to the government's interpretation of the statutory anti-cutback rule or ERISA's other provisions. Indeed, *McCoy* acknowledged that the same level of "deference [i]s [not] warranted to an agency interpretation of what [a]re, in fact, Congress' words." *Id.* at 882. *McCoy* distinguished in this regard *Gonzales v. Oregon*, 546 U.S. 243 (2006), where "the regulation in question did 'little more than restate the terms of the statute' pursuant to which the regulation was promulgated." *Id.* at 881–82 (quoting *Gonzales*, 546 U.S. at 257). Just as an agency's litigating position is not entitled to deference when the regulation it seeks to interpret does "'little more than restate the terms of the statute,'" *id.* (quoting *Gonzales*, 546 U.S. at 257), the government's brief

here is not entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), insofar as it interprets the statutory text directly. *See Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008).

Nonetheless, the government's position "is entitled to a measure of deference proportional to its power to persuade, in accordance with the principles set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 [] (1944)." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008). "Even where not binding, . . . agency choices 'certainly may influence courts facing questions the agencies have already answered.' In such an instance, '[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances.'" *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 941 (9th Cir. 2008) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). "[T]he weight given to the agency's interpretation depends on 'the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.'" *Id.* (quoting *Mead*, 533 U.S. at 228). For the reasons discussed below, we find the government's interpretation of the anti-cutback rule reasonable and persuasive, and so give it some weight.

## B.

DHL and the government contend that the elimination of the transfer option did not violate the anti-cutback rule because "in neither plan was the participant's accrued benefit reduced or eliminated." To the degree that the anti-cutback rule prohibits amendments that reduce "[t]he *accrued benefit* of a participant under a plan," 29 U.S.C. § 1054(g)(1)

(emphasis added), if Plaintiffs' complaint alleges no such reduction, it fails as a matter of law in that respect.

ERISA defines "accrued benefit" as follows:

> (A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age, or

> (B) in the case of a [defined contribution] plan . . . , the balance of the individual's account.

29 U.S.C. § 1002(23).

Plaintiffs have not alleged that the elimination of the transfer option reduced the balance of their Profit Sharing Plan accounts. Accordingly, there has been no reduction of Plaintiffs' "accrued benefit" in the defined contribution plan.

With regard to the Retirement Income Plan — the defined benefit plan to which DHL's 2004 amendment directly applies — the statutory definition of "accrued benefit" is not as clear, providing only "(1) a tautological reference to the individual's accrued benefit; and (2) a somewhat more enlightening reference to the plan." *Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 750 F.2d 1458, 1463 (9th Cir. 1985). We therefore look to the Retirement Income Plan document itself to determine what "accrued benefit" means in the context of that plan.

We begin with section 4.01 of the Retirement Income Plan, entitled "Accrued Benefit."[6]  It is contained within Article IV of the plan, also entitled "Accrued Benefits." Section 4.01 states that "[a] Participant who qualifies for participation in the Plan shall earn an Accrued Benefit, payable in the normal form of benefit at Normal Retirement Age determined as follows . . . ."  Paragraphs (A) and (B) of that section initially describe the "formula" for calculating "a Participant's Accrued Benefit" as a multiple of the participant's years of service by a percentage of his average monthly compensation.  But those paragraphs specifically note that the "Accrued Benefit" is to be calculated "[s]ubject to the benefit offset under paragraph C of this Section 4.01."

Paragraph (C) establishes the offset feature of the plan, stating that "[a] Participant's benefit determined under paragraphs A and/or B above shall be reduced by the Participant's Profit Sharing Plan Annuity Benefit, if any, as determined under this paragraph."  It then goes on to describe how "a Participant's Profit Sharing Plan Annuity Benefit" is calculated.  Section 4.01 was not altered by DHL's 2004 amendment, and is not here challenged.

Section 4.01 does not mention the transfer option.  The transfer option is described, instead, in section 7.11 of the Retirement Income Plan, a section entitled "Transferred

---

[6] DHL filed copies of the Retirement Income Plan and Profit Sharing Plan documents along with its appellate brief.  Although these documents were not attached to the complaint, they were incorporated by reference therein, and were part of the record before the district court.  Plaintiffs did not object to the introduction of these documents below or on appeal.  We therefore consider them to the extent they are useful in resolving this case. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (discussing the doctrine of incorporation by reference in Rule 12(b)(6) cases).

Profit Sharing Account."[7]   Section 7.11 is contained within Article VII, entitled "Payment of Benefits."   Section 7.11 alone was amended in 2004, by eliminating participants' right to transfer their Profit Sharing Account balances to the Retirement Income Plan.

The anti-cutback rule prohibits any reduction of an "accrued benefit."  29 U.S.C. § 1054(g).  If that term means, in the context of DHL's plan, benefits calculated in accordance with the formula described in section 4.01, then eliminating the transfer option did not reduce participants' accrued benefit.  The 2004 amendment did not change the formula for calculating benefits in the Retirement Income Plan — they are, and have always been, calculated on the basis of a participant's final average compensation and years of service, with an offset for an attributed annuity amount based on the participant's account balance, if any, in the Profit Sharing Plan.  Furthermore, there is no textual support for Plaintiffs' contention that section 7.11's transfer option should be treated as part of a participant's statutory "accrued benefit."

That the formula set forth in section 4.01 fully defines the scope of what constitutes an "accrued benefit" under the Retirement Income Plan is further evidenced by the language and structure of that Plan as a whole, considered in light of ERISA's definition of an "accrued benefit."  ERISA defines an "accrued benefit" as "the individual's accrued benefit determined under the plan and . . . *expressed in the form of an*

---

[7] Section 7.11 provides that "[a] Participant may transfer his/her nonforfeitable Employer Profit Sharing Plan account balance to this Plan in order to be paid an annuity benefit from such transferred account balance."

*annual benefit commencing at normal retirement age.*" 29 U.S.C. § 1002(23)(A) (emphasis added). Section 4.01 describes how "an Accrued Benefit, *payable in the normal form of benefit at Normal Retirement Age*" is "determined," under the Retirement Income Plan. Such language indicates that section 4.01 defines a participant's "accrued benefit." Moreover, the transfer option's placement in Article VII, concerning "Payment of Benefits," rather than Article IV, which covers "Accrued Benefits," further demonstrates that section 7.11 describes something other than an "accrued benefit."

Plaintiffs disagree, arguing that the term "accrued benefit" is defined differently with regard to a floor-offset plan like DHL's. Plaintiffs cite a portion of an Internal Revenue Service Revenue Ruling that discusses the conditions a floor-offset plan must satisfy to meet the Internal Revenue Code's minimum vesting requirements. The Ruling states that an "accrued benefit" in a floor-offset plan will meet minimum vesting requirements only if:

> (1) the accrued benefit under the defined benefit plan *determined without regard to the offset derived from the profit-sharing plan* satisfies the [minimum vesting] requirements . . . ; and (2) the offset to the benefit otherwise payable is equal to the amount deemed provided on the determination date by the vested portion of the account balance in the profit-sharing plan . . . .

Rev. Rul. 76-259, 1976-2 C.B. 111 (1976) (emphasis added). Plaintiffs rely on the italicized language to suggest that DHL's two plans should be treated as a "fully integrated

arrangement," and thus any amendment that affects the combined take-home monthly benefits under the plans, as DHL's elimination of the transfer option did here, should be treated as reducing an "accrued benefit" in violation of the anti-cutback rule.

But the Revenue Ruling does not change the definition of an "accrued benefit" established in 29 U.S.C. § 1002(23), or the general notion that an accrued benefit for a floor-offset plan is defined by reference to the terms of each of the two plans at issue. Instead, it confirms that the "accrued benefit" of a defined benefit plan is separate from the offset applied; and it adds, for minimum vesting purposes, an independent requirement regarding the offset — that it be equal to the vested portion of the defined contribution plan — that Plaintiffs do not contend has been violated here.

Further, 26 U.S.C. § 414(k), which Plaintiffs also cite, states that for purposes of the provision defining "accrued benefit,"[8] floor-offset plans are "treated as consisting of a defined contribution plan to the extent benefits are based on the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan." 26 U.S.C. § 414(k). With regard to DHL's plans, then, § 414(k) means that the "accrued benefit" of the offset (which is "based on the separate account," *id*.) is defined as "the balance of the individual's account," and the "accrued benefit" of the remainder is defined as "the individual's accrued benefit determined under the plan and . . . expressed

---

[8] Section 414(k) cites 26 U.S.C. § 411(a)(7), the Internal Revenue Code provision defining "accrued benefit." The Internal Revenue Code definition is substantively identical to the definition contained in ERISA, 29 U.S.C. § 1002(23), which we quote throughout this opinion.

in the form of an annual benefit commencing at normal retirement age," 29 U.S.C. § 1002(23).  Neither of the provisions Plaintiffs cite indicates that the transfer option described in section 7.11 should be considered part of the "accrued benefit" under the particular terms of DHL's defined benefit plan.

In sum, after the 2004 plan amendment, the "accrued benefits" of both the defined contribution and the defined benefit plans remained intact.  We therefore conclude that the reduction of periodic benefits paid from the Retirement Income Plan that resulted from DHL's elimination of the transfer option did not violate 29 U.S.C. § 1054(g)(1).  That conclusion does not, however, entirely resolve this case.

## C.

Even if no "accrued benefit" was otherwise reduced, the 2004 amendment eliminated the transfer option.  The anti-cutback rule "treat[s] as reducing accrued benefits" any "plan amendment which has the effect of . . . eliminating an optional form of benefit."  29 U.S.C. § 1054(g)(2).  If the transfer option was an "optional form of benefit," as Plaintiffs suggest, then eliminating it alone could be a "cutback" under ERISA, regardless of the effect of that elimination on participants' other benefits under each of the two plans.

Whether Airborne's transfer option was an "optional form of benefit" has vexed the other courts to consider the question, as well as the government.  The district court in *Tasker* expressly declined to "decide whether the right to transfer benefits from one account to another . . . is an optional form" because Regulation A–2 "alone requires dismissal of [Tasker's] claim, even if the transfer right is an

optional form of benefit." 2009 WL 4669936 at *4. The First Circuit, by contrast, held the transfer right to be an "ancillary benefit," not an "optional form of benefit." *Tasker*, 621 F.3d at 41–42. The district court in this case simply failed to mention whether the transfer option was an "optional form of benefit." And the government asserts briefly, without citation, that it was not.

A Treasury regulation defines an "optional form of benefit" as

> a distribution alternative . . . that is available under the plan with respect to an accrued benefit or . . . a retirement-type benefit. Different optional forms of benefit exist if a distribution alternative is not payable on substantially the same terms as another distribution alternative. The relevant terms include all terms affecting the value of the optional form, such as the method of benefit calculation and the actuarial factors or assumptions used to determine the amount distributed.

26 C.F.R. § 1.411(d)–3(g)(6)(ii)(A). A different Treasury regulation addresses whether the "transfer of benefits between and among defined benefit plans and defined contribution plans (or similar transactions) violate[s] the requirements of" the anti-cutback rule. *Id.* § 1.411(d)–4, Q–3. That regulation states clearly that "[a] right to a transfer of benefits from a plan pursuant to the elective transfer rules of this paragraph (c) *is an optional form of benefit* under" the anti-cutback rule. *Id.* at A–3(c)(2)(ii) (emphasis added); *see also id.* at A–2(a)(2)(ii) ("[A]n elective transfer of an

otherwise distributable benefit is treated as the selection of an optional form of benefit").

With respect to the plans at issue, these regulations make clear that a participant's right to transfer his benefits "*from*" the Profit Sharing Plan *is* an optional form of benefit. *Id.* at A–3(c)(2)(ii) (emphasis added). But the 2004 amendment did not modify the Profit Sharing Plan; that plan continues to allow transfers to any eligible retirement plan that will accept them. DHL amended only section 7.11 of the Retirement Income Plan, stating that it "shall not accept transfers of any Profit Sharing Plan account balances after December 31, 2004." The 2004 amendment would thus constitute a cutback only if the Retirement Income Plan's *acceptance* of transfers is a "distribution alternative," i.e., an "optional form of benefit." 26 C.F.R. § 1.411(d)–3(g)(6)(ii)(A). Although the government's amicus brief seems to suggest it is not, it provides no analysis meriting deference, and Plaintiffs provide no answer to this question.[9]

---

[9] The government also suggests in passing that because a different statutory provision not mentioned in the parties' briefing, 26 U.S.C. § 401(a)(31)(A), now *requires* defined contribution plans to allow participants to transfer their balances to any "eligible retirement plan" willing to accept transfers, *id.*, a transfer option "no longer constitutes a separate optional form of benefit if it is also provided for under broader plan terms." Regardless whether the government's interpretation is correct, it is irrelevant to this appeal. Section 401 requires defined contribution plans to allow transfers, but *only* to other defined contribution plans. *See* 26 U.S.C. § 401(a)(31)(E) (defining "eligible retirement plan" by reference to another statutory provision, except that "a qualified trust shall be considered an eligible retirement plan *only if it is a defined contribution plan*" (emphasis added)). Although a defined contribution plan *may* by regulation allow transfers to defined benefit plans, *see* 26 C.F.R. § 1.401(a)(31)–1, the statute does not required it to do so. And nothing in 26 U.S.C. § 401(a)(31) requires any plan to *accept* transfers.

We need not decide whether the Retirement Income Plan's acceptance of a transfer was an "optional form of benefit" to resolve this appeal.  If the transfer option was *not* an "optional form of benefit," then DHL could have eliminated it without being considered to have reduced or eliminated an "accrued benefit" in violation of the anti-cutback rule.   And even if the transfer option *was* an "optional form of benefit," and was thus protected by the anti-cutback rule, paragraph (2) of the anti-cutback statute explicitly authorizes the Secretary to waive its application for plan amendments eliminating an "optional form of benefit." *See* 29 U.S.C. § 1054(g)(2) ("The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B)," concerning the elimination of "an optional form of benefit"). That is precisely what Regulation A–2 accomplishes. *See* 26 C.F.R. § 1.411(d)–4, Q& A–2(b)(2)(viii) ("A plan may be amended to eliminate provisions permitting the transfer of benefits between and among defined contribution plans and defined benefit plans.").

In short, this case fits squarely within the regulatory exception for elimination of an "optional form of benefit," even if the transfer option was such a benefit.  We therefore agree with the district court that the 2004 amendment did not,

---

As the only change wrought by the 2004 amendment was the defined benefit plan's refusal to accept transfers from the defined contribution plan, that amendment is not affected by § 401(a)(31).

as a matter of law, violate the anti-cutback rule.  We affirm the dismissal of Plaintiffs' complaint.[10]

## III.

Like the First Circuit, we are deeply troubled by this case. *See Tasker*, 621 F.3d at 43.  The Plaintiffs "worked for many years, planned for [their] retirement, and now find[] that the annuity [they] can collect is[, for some,] roughly half the size that [they] had anticipated." *Id.*  To the extent that ERISA's anti-cutback rule is designed to "protect[] employees' justified expectations of receiving the benefits their employers promise them," it has failed to do so here. *Heinz*, 541 U.S. at 743.

We note that what we see as the real source of the problem is referred to only obliquely in the briefs: the differential actuarial assumptions used to calculate participants' benefits under the Retirement Income Plan and the Profit Sharing Plan.  Under the Profit Sharing Plan, participants are entitled to take their account balances as a lump sum payment or as an annuity.  In calculating the

---

[10] As we conclude that the complaint fails to state a claim, we need not consider DHL's alternative arguments that the complaint is time-barred and that Plaintiffs' breach of fiduciary duty claim is not cognizable under 29 U.S.C. § 1132(a)(3).

Nor need we decide whether the district court abused its discretion in denying Plaintiffs' motion for reconsideration.  In that motion, Plaintiffs sought to argue that, to the extent Regulation A–2 permitted DHL to eliminate the transfer option and the result of that elimination was a reduction in participants' other "accrued benefit[s]," the Secretary exceeded his statutory authority in promulgating Regulation A–2.  We have concluded that the elimination of the transfer right did *not* result in a reduction of other "accrued benefit[s]" under the terms of either plan.

annuity value, it appears that the Profit Sharing Plan uses one set of actuarial assumptions about, e.g., a participant's lifespan, market conditions, etc. As Plaintiffs' counsel explained at oral argument, however, in calculating the amount of offset, the Retirement Income Plan takes the same Profit Sharing Plan account balance, and applies a different, more favorable, set of actuarial assumptions, resulting in an offset that is considerably higher than the annuity actually payable from the aggregated defined contribution funds.[11]

For example, imagine Mr. Andersen retires with $350,000 in his Profit Sharing Plan account.[12] The Profit Sharing Plan will allow him to take his benefit as either a lump sum or a monthly annuity, which the plan calculates as $3,000, using one set of actuarial assumptions. But suppose Mr. Andersen has also been guaranteed, under the terms of the Retirement Income Plan, a defined monthly benefit of $5,000. Before paying him the $5,000 benefit, the Retirement Income Plan

---

[11] As we discuss above, *supra* n. 2, the language of the Retirement Income Plan indicates that participants who chose to exercise the transfer right received an additional benefit — beyond simply eliminating the effect of the offset — because they were paid annuities from the Retirement Income Plan calculated using that plan's favorable actuarial assumptions, but based on the value of their Profit Sharing Plan accounts. Although Plaintiffs did not mention this additional benefit in their briefs or at oral argument, it appears to us that the significant reduction in participants' take-home periodic benefits after the 2004 amendment was therefore caused by the *combination* of (1) participants' inability to drop their Profit Sharing Plan account balances to zero, thus eliminating the effect of the offset; *and* (2) the fact that they would no longer receive with their Profit Sharing Plan accounts an annuity calculated using the assumptions of the Retirement Income Plan.

[12] All numbers are entirely hypothetical, both in actual and relative amounts.

looks to Mr. Andersen's account balance in the Profit Sharing Plan to determine the amount of the offset. Using the same $350,000 but applying more favorable actuarial assumptions, the Retirement Income Plan calculates a monthly annuity of $6,000 for Mr. Andersen. As a result, once offset, Mr. Andersen receives no benefit from the Retirement Income Plan.

Pursuant to the terms of the Retirement Income Plan, Mr. Andersen is not entitled to a benefit because the "floor" — the "guaranteed benefit level is established in the defined benefit plan" — has been met by the "annuity value of the defined contribution plan." *People Are Asking . . . What is a floor-offset plan?*. But in reality, all Mr. Andersen will get, if he takes his Profit Sharing Plan benefit in annuity form, is the $3,000 monthly annuity calculated by the Profit Sharing Plan. The Retirement Income Plan is thus offsetting Mr. Andersen's guaranteed defined benefit by a hypothetical annuity amount that will never in fact be available to him under the terms of the Profit Sharing Plan.

Within this system, it is clear why most, if not all, participants would have chosen to exercise the transfer option prior to its elimination. It was far better for Mr. Andersen to transfer the full amount of his Profit Sharing Plan account, which would drop that balance to zero and eliminate the effect of the offset. Were he to do that in the example we provided, he would be entitled to (at least, *see supra* n. 2) the full $5,000 guaranteed benefit from the Retirement Income Plan instead of the $3,000 monthly annuity from the Profit Sharing Plan. The only participant who would have chosen not to exercise the transfer option would be one who had amassed enough money in his Profit Sharing Plan account that he would be entitled to a monthly annuity exceeding

$5,000, even with the unfavorable actuarial assumptions. The complaint alleges that Plaintiffs are not in that fortunate situation.

Notwithstanding our concerns, Plaintiffs have not challenged the differential actuarial assumptions used by the two plans, and DHL's 2004 amendment did not alter them. So what we see as the inequity occasioned by this procedure is of no legal significance in this case.[13]   For the reasons stated above, we must affirm the district court.

**AFFIRMED.**

---

[13] It appears that the Secretary might be able to correct this problem, should he choose to do so.  A current Treasury regulation regarding floor-offset plans requires that  "the accrued benefit . . . that would otherwise be provided to an employee under the defined benefit plan must be reduced *solely* by the *actuarial equivalent* of all or part of the employee's account balance attributable to employer contributions under a defined contribution plan maintained by the same employer."   26 C.F.R. § 1.401(a)(4)–8(d)(i) (emphasis added).   Several regulations require that "actuarial equivalence must be determined in a uniform manner for all employees using reasonable actuarial assumptions."   *Id*. § 1.401(a)(4)–3(f)(5)(ii)(e)(7).  Given that the Secretary already requires that actuarial assumptions be "uniform" and "reasonable," to the extent he views the use of different, unrealistic actuarial assumptions to calculate the offset in a floor-offset plan as undermining ERISA's objectives, he may have the regulatory discretion to put an end to the practice.